**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dyan Buskohl,<br><br>Plaintiff,<br><br>vs.<br><br>Commissioner of Social Security,<br><br>Defendant. | No. CV 10-02115-PHX-NVW<br><br>**ORDER** |

Plaintiff Dyan Buskohl applied for disability benefits and was denied initially and upon reconsideration. She then received two hearings before Administrative Law Judge Joan G. Knight, who eventually determined that Buskohl had been disabled for a closed period. Buskohl has appealed to this Court under 42 U.S.C. §§ 405(g) and 1383(c)(3), arguing that the she has been disabled both before and since the closed period. The ALJ's decision will be affirmed.

**I.  BACKGROUND**

**A.  Buskohl's Medical, Occupational, and Social History**

The ALJ granted a closed period of disability from May 6, 2006 to June 30, 2007 ("Closed Period"). Given this conclusion, and Buskohl's challenges to it, Buskohl's history is best understood by dividing it into four time periods: (1) before the alleged disability onset date of September 30, 2004; (2) from the alleged onset date to the beginning of the Closed Period; (3) during the Closed Period; and (4) from the end of the Closed Period to the time of the ALJ's decision.

### 1. Buskohl's Condition Before the Alleged Disability Onset Date

Before the alleged onset of her disability in 2004, Buskohl had a high school education and worked as a cashier and a retail salesperson. Buskohl claims that mental health troubles — which have existed since childhood — plagued her during this period of life. She frequently felt depressed, and began receiving prescription antidepressant drugs as early as 2002. Despite her medications, she had difficulty staying on task at work, interacting appropriately with co-workers and customers, and similar problems. She was fired from her last job, in 2004, supposedly based on an accusation of theft, although Buskohl believes that her pregnancy at that time was the true motivating factor.

Buskohl did not take her antidepressant medications while pregnant, but she resumed those medications in September 2004, shortly after her baby was born. Buskohl now claims that her disability began on September 30, 2004, at age 21.

### 2. Buskohl's Condition from the Alleged Onset Date to the Beginning of the Closed Period

From October 2004 through April 2006, Buskohl's medical records reflect GAF scores between 50 and 55.[1] Buskohl continued to have depressed episodes, including thoughts of suicide, as well as manic episodes. As early as December 2004, and possibly earlier, Buskohl was diagnosed as bipolar. Her doctors adjusted her medication in response to her symptoms, with varying success.

---

[1] GAF, or "Global Assessment of Functioning," ranks psychological, social, and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100. A GAF rating of 31 to 40 indicates some impairment in reality testing or communication, or major impairment in several areas such as work, family relations, judgment, thinking, or mood; a rating of 41 to 50 indicates serious symptoms or serious impairment in social or occupational functioning; a rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social or occupational functioning; and a rating of 61 to 70 indicates "mild symptoms" or some difficulty in social or occupational functioning, but generally functioning well. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (Text Rev. 4th ed. 2000).

Buskohl spent most of her days taking care of her son, but Buskohl lived with her parents and relied on them to take care of her son when Buskohl was in a mentally unbalanced state. During such states, she often neglected personal grooming and housework.

During this time period, Buskohl apparently chatted with men on the Internet and then met with them in person on occasion. She also interacted with a nearby cousin, and she dated a man she met at a Sonic Drive-In restaurant.

In early 2006, medical professionals described Buskohl's symptoms as "anger, irritability, frustration, emotional[] sensitivity, depression, low energy, past [suicidal ideation], impulsivity (pierced tongue without thought, spending [money] excessive[ly], hypersexual) and sleeplessness for days." (Tr. 650.)

### 3. Buskohl's Condition During the Closed Period

In early May 2006, Buskohl checked into a suicide prevention program. Buskohl reported experiencing vivid dreams, including dreams about harming her son. Buskohl had also been thinking about suicide more frequently. She checked herself out a few days later because she did not like the treatment. Nonetheless, her symptoms of depression, mania, anxiety, irritability, impulsiveness, and sleep problems continued at a more pronounced level. The state of Arizona determined that Buskohl was "SMI," or seriously mentally ill, in late May 2006. In July 2006, a psychiatrist, Dr. Zerrudo, began treating Buskohl on a fairly regular basis. Dr. Zerrudo (or his staff) frequently adjusted Buskohl's medications.

During the Closed Period, Buskohl's GAF scores started at 35 (when she checked herself into treatment) and remained low for a few months, but improved to 70 by April 2007, then receded to the 60–65 range in May 2007.

In June 2007, at the end of the closed period, a state agency examining doctor, Dr. Salk, interviewed Buskohl as part of the disability application process. Dr. Salk opined that Buskohl was "moderately limited" in her ability to maintain attention and concentration for extended periods, to complete a normal workday, to get along with co-

workers, and to set goals and act independently. (Tr. 342–45.) Dr. Salk concluded that Buskohl was only mildly limited, if at all, in other areas of life.

### 4. Buskohl's Condition from the End of the Closed Period to the Time of the ALJ's Decision

After the Closed Period, Buskohl continued to suffer symptoms of her mental ailments, and her medications were frequently adjusted. Despite her symptoms, some of Buskohl's care providers noted progress, including better attention, concentration, insight, and judgment. Sometimes Buskohl reported that her medications were working. Buskohl also apparently spent more time playing with her son, visiting a friend, going out to eat, and swimming.

In October 2008, Buskohl's treating psychiatrist, Dr. Zerrudo, opined that Buskohl was "severe[ly]" limited in her ability to accept, understand, remember, and carry out detailed instructions, and her ability to respond appropriately to criticism. Dr. Zerrudo also noted "moderately severe" limitations in Buskohl's ability to complete a normal workday, to get along with co-workers, to respond to changes in work setting, and to travel to unfamiliar places or use public transportation. Finally, Dr. Zerrudo (like Dr. Salk) noted "moderate" limitation in Buskohl's ability to maintain attention and concentration for extended periods. (Tr. 416–21.) Dr. Zerrudo reached identical conclusions in April 2009. (Tr. 737–42.)

Buskohl's GAF scores during this time began in the 60–65 range, and fluctuated from a high of 65–70 in October 2007 to a low of 50 in April 2009.

### B. Administrative Proceedings

### 1. Buskohl's First ALJ Hearing

Buskohl first appeared before the ALJ in February 2009. At the hearing, she related her history and symptoms generally as described above. She claimed inability to work because she loses concentration easily, gets overwhelmed easily, has trouble handling criticism or even the thought of potential criticism, and impulsively says inappropriate things. Buskohl reported napping during the day — while her son is at

- 4 -

preschool — because her medications sometimes make her sleepy. Other days, she has manic episodes where she has too much energy and cannot stop doing projects. She reported socializing only with family members. She also confirmed that she can drive, and that she uses a computer daily.

A vocational expert, Sandra Richter, also testified at the hearing. The expert classified Buskohl's previous jobs as light, semi-skilled. The ALJ did not ask the vocational expert if Buskohl could still perform any of her previous jobs. Instead, the ALJ asked the vocational expert "to consider a hypothetical person the same age, education and work history as Ms. Buskohl. If this person were restricted to simple, unskilled work tasks, is there any work this hypothetical person could perform?" (Tr. 92.) In response, the expert identified packaging, production, and inspector positions existing in substantial numbers in the national and local economies. (*Id.*)

When asked by the ALJ whether work existed for a person who matches Dr. Zerrudo's October 2008 opinion of Buskohl (*i.e.*, a person with several severe and moderately severe mental limitations), the expert opined that no work existed. When asked by Buskohl's counsel whether work existed for a person with "moderately limited . . . ability to maintain attention and concentration for extended periods" (apparently a reference to Dr. Salk's July 2007 opinion), the expert responded elliptically: "any job . . . [requires] maintain[ing] attention and concentration throughout the working day." (Tr. 93–94.) When asked by Buskohl's counsel whether work existed for Buskohl, "[i]f we accepted her testimony," the expert replied, "I believe that based on her testimony, she cannot work." (Tr. 95.)

### 2. Buskohl's Second ALJ Hearing

In April 2009, the ALJ convened a second hearing to take testimony from Dr. Finn, a state agency reviewing (*i.e.*, non-examining) physician and medical expert. It quickly became apparent that Dr. Finn had not received all of Buskohl's medical records. Specifically, he did not have Dr. Zerrudo's October 2008 and April 2009 opinions.

Nonetheless, the hearing went forward based on the many other records Dr. Finn reviewed, including Dr. Zerrudo's treatment records.

Dr. Finn did not explain his view of the evidence before May 2006. Dr. Finn concluded that Buskohl was markedly limited in her social functioning from the time she checked herself into suicide prevention care in May 2006 through about June 2007. Between May 2006 and June 2007, he saw evidence of Buskohl's difficulties with all aspects of life. But Buskohl's gradually rising GAF scores convinced Dr. Finn that Buskohl had substantially improved by the end of June 2007, to the point of only moderate or mild limitations. Like Drs. Zerrudo and Salk, Dr. Finn opined that Buskohl continues to have "moderate" limitations in her ability to maintain attention and concentration for extended periods. As to the ability to understand and carry out instructions, Dr. Finn testified that Buskohl's impairment would be "mild if it were simple, routine work." (Tr. 63.)

Regarding the period before May 2006, Buskohl's attorney asked Dr. Finn if his opinion might change if he had seen a document from the state declaring Buskohl serious mentally ill in May 2005, or a document from December 2004 stating a GAF score of 51. Dr. Finn responded that he had not seen any such documents, but the May 2005 SMI determination, if it existed, could influence his opinion, and the December 2004 GAF score of 51 would indicate "serious impairments in both social and occupational functioning" at that time. (Tr. 65–66.)

The ALJ concluded the hearing by apologizing for not having forwarded all of Buskohl's medical records to Dr. Finn. Buskohl's attorney urged the ALJ to find disability back to the onset date based in part on records Dr. Finn had not seen. The ALJ responded:

> Well, how about this, since I have this opinion regarding [a] specific time period [*i.e.*, May 2006 through June 2007], I'm going [to go] ahead and look at this again . . . and compare it. If there's nothing inconsistent, then I won't go ahead and reschedule a supplemental hearing. If it's a question I cannot

>     resolve favorably to Ms. Buskohl, I'll go ahead and schedule
>     a supplemental hearing.

(Tr. 67.) The ALJ did not call a supplemental hearing.

### C. The ALJ's Decision

At its core, the ALJ's opinion relies on Dr. Finn's conclusions. The ALJ therefore granted the Closed Period of disability from May 4, 2006 through June 30, 2007.

#### 1. Pre-Closed Period Reasoning

According to the ALJ, Buskohl had "no more than minimal limitations" before the Closed Period. "She maintained an active lifestyle and social life during her pregnancy and after her baby was born." (Tr. 34.) "Active lifestyle and social life" seems to refer to Buskohl's habit of meeting people with whom she chatted on the Internet, her boyfriend from Sonic Drive-In, and perhaps interaction with her cousin. The ALJ also noted that Buskohl was "the primary caregiver of son" and "[c]aring for young children can be quite demanding which tends to suggest that she [was] not . . . significantly limited." (Tr. 36.) The ALJ also concluded that Buskohl's medications produced "good results prior to May 2006." (Tr. 39.)

#### 2. Post-Closed Period Reasoning

Regarding the post-Closed Period time frame, the ALJ explicitly adopted Dr. Finn's conclusions, summarizing them as follows:

> The medical expert [Dr. Finn] testified that from July 2007 to the date of the hearing, [Buskohl] had a mild to moderate restriction in activities of daily living, a moderate impairment in social functioning and moderate difficulty maintaining concentration, persistence and pace. . . . The medical expert further testified that he felt that the claimant could have completed a normal work day and respond appropriately to supervision from June 2007 to the present. During this time frame, she would have been able to get along with coworkers and peers. She could have completed a normal workday without psychologically based symptoms. She would have a moderate impairment getting along with supervisors and accepting criticism. . . . [S]he would have encountered problems with responding favorably on a consistent basis. [Buskohl]'s ability to understand and remember and carry out simple instructions was mildly impaired. . . . [Buskohl] would be able to have routine interaction with the public, but not frequent interaction. She could complete job tasks and

- 7 -

> work effectively with the public, so long as it would be sustainable work without job changes. If simple and routine tasks, she would do fairly well. The undersigned agrees with and adopts the opinion of the medical expert.

(Tr. 33–34.) The ALJ also claimed "overwhelming evidence in the record to support the [Dr. Finn]'s testimony that the claimant's condition did improve and that she has not been precluded from performing all work related activity since June 30, 2007." (Tr. 34.) The ALJ did not elaborate on this "overwhelming evidence" except to again note that Buskohl is her son's primary caregiver, and that Buskohl could perform household chores and run errands. The ALJ also noted that Buskohl was functional enough to help her father after he had a motorcycle accident, and that Buskohl's claimed inability to concentrate was belied by "activities which require the ability to concentrate such as driv[ing] and us[ing] a computer." (Tr. 36.)

As for Dr. Zerrudo, the ALJ did not give his evaluations controlling weight

> for several reasons. Dr. Zer[r]udo has reported that [Buskohl] has moderate to severe limitations in a number of areas. However as previously discussed, treatment records indicate that [Buskohl]'s condition has been stable with medication and [her] Global Assessment of Functioning have [*sic*] been as high as 70, which does not support a finding that the claimant has a moderate to severe limitation in any area. Moreover, [Buskohl]'s activity level suggests that she would not have moderate to severe limitations in the areas noted. [She] has been able to care for her young son and she has been the primary caregiver. Similarly, while [she] may have some limitation in social functioning, treatment records do not support a finding of moderate to severe limitations in this area.

(Tr. 41.)

Concerning Dr. Salk's June 2007 conclusions, the ALJ stated that "Dr. Salk's opinion supports the conclusion reached in this decision that [Buskohl]'s condition was improving by June 2007." (Tr. 35.)

### 3. Residual Functional Capacity & Available Jobs

The ALJ's opinion assessed Buskohl's residual functional capacity as follows: "capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple unskilled work tasks."

(Tr. 36.) The opinion goes on to state that "[t]he vocational expert testified that this claimant, given the above noted limitations, is unable to perform the demands of her past relevant work." (Tr. 43.) Although the vocational expert offered no such testimony, the ALJ nonetheless "agreed" with it and concluded that Buskohl cannot perform her past work. The ALJ then agreed with the vocational expert's actual testimony, concluding that Buskohl retains the capacity to perform certain simple, unskilled jobs — packager, production worker, and inspector. Sufficient numbers of these jobs exist in both the national and local economy. Accordingly, the ALJ found Buskohl not disabled outside of the Closed Period.

## II.  GENERAL STANDARD OF REVIEW

The Court will uphold the ALJ's final decision if it is supported by substantial evidence and not based on legal error. *See* 42 U.S.C. § 405(g); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). The substantial evidence standard requires the evidence, as a whole, to be "more than a mere scintilla but not necessarily a preponderance" and otherwise sufficient such that "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Tomassetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotation marks omitted). Further, if the "evidence is susceptible to more than one rational interpretation" and the ALJ's decision is supported by one such rational interpretation, the Court will affirm the ALJ. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

The Court will review only the issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 235 F.3d 503, 517 n.13 (9th Cir. 2001). The Court will not reverse for harmless error, which exists "when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tomassetti*, 533 F.3d at 1038 (internal quotation marks omitted). However, the Court will "review the ALJ's decision based [only] on the reasoning and factual findings offered by the ALJ." *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1225 (9th Cir. 2009). The Court will not "attempt to intuit what the adjudicator may have been thinking." *Id*.

## III. ANALYSIS

### A. Before the Closed Period

Buskohl argues that she did not receive a full and fair hearing because the ALJ did not call a third evidentiary hearing, as the ALJ suggested she might do because Dr. Finn had not received all of Buskohl's medical records. But it's not clear that the ALJ can be held by estoppel to her promise of another hearing,[2] and in any event, the ALJ's opinion about Buskohl before May 2006 did not rely on medical evidence for which expert medical interpretation from Dr. Finn might be needed. Instead, the ALJ focused on Buskohl's activity level, including her ability to care for her son, to help out around the house, and to socialize outside of the house.

Buskohl disputes the ALJ's interpretation of her activity level. However, the "evidence is susceptible to more than one rational interpretation" and the ALJ's decision offers one such rational interpretation. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Accordingly, it will be affirmed. *Id.*

### B. After the Closed Period

#### 1. Buskohl's Credibility

"[A] claimant who alleges disability based on subjective symptoms" — such as Buskohl's mental limitations — "need not produce objective medical evidence of the [symptom] itself, or the severity thereof." *Smolen*, 80 F.3d at 1281–82. Instead, she must (a) "produce objective medical evidence of an impairment or impairments" and (b) "show that the impairment or combination of impairments could reasonably be expected to (not that it did in fact) produce some degree of [the subjective] symptom." *Id.*

The ALJ here found these two elements satisfied, but also discounted Buskohl's credibility. Given this, the ALJ could not reject Buskohl's testimony about the limiting

---

[2] *See generally Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414 (1990) (discussing estoppel against a government agency); *Schweiker v. Hansen*, 450 U.S. 785 (1981) (same).

effects of her mental problems without "mak[ing] specific findings stating clear and convincing reasons for doing so. The ALJ [was required to] state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Id.* at 1284 (citation omitted); *see also Morgan v. Comm'r of SSA*, 169 F.3d 595, 599 (9th Cir. 1999) ("The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints."). Whether the ALJ properly did so matters because the vocational expert testified that there would be no work for someone with the limitations Buskohl ascribes to herself.

Here, the ALJ fulfilled her duty explain her decision with clear and convincing reasons. The ALJ compared Buskohl's statements about what she cannot do to the statements about the many things she can do. The ALJ also compared Buskohl's statements to her medical records, which show that Buskohl's symptoms were well-controlled with medication before and after the Closed Period, as reflected by her GAF scores. The ALJ therefore clearly and convincingly explained her conclusion that Buskohl's limitations are far less severe than Buskohl claims. The ALJ did not err in discounting Buskohl's credibility.

### 2. Weight of Medical Expert Testimony

Once a person becomes disabled, the government may not withdraw disability benefits unless there is substantial evidence of "medical improvement . . . (other than medical improvement which is not related to the individual's ability to work)" permitting the person to engage in substantial gainful activity. 42 U.S.C. § 1382c(a)(4)(A)(i)(I)–(II). Buskohl argues that substantial evidence of medical improvement did not exist, with heavy emphasis on the ALJ's weighing of the various doctors' opinions.

#### a. Legal Standard

In this case, whether substantial evidence of medical improvement existed turned in large part on the ALJ's treatment of Dr. Zerrudo's, Dr. Salk's, and Dr. Finn's respective opinions. In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, such

as Dr. Zerrudo, who actually treat the claimant; (2) examining physicians, such as Dr. Salk, who examine but do not treat the claimant; and (3) non-examining physicians, such as Dr. Finn, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight should be given to the opinion of a treating physician than to the opinions of non-treating physicians. *Id*. A treating physician's opinion is afforded great weight because such physicians are "employed to cure and [have] a greater opportunity to observe and know the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Moreover, the ALJ must give weight to the treating physician's subjective judgments in addition to his clinical findings and interpretation of test results. *Id*. at 832–33.

An examining physician's opinion generally must be given greater weight than that of a non-examining physician. *Id*. at 830. As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, and specific and legitimate reasons, supported by substantial evidence in the record, for rejecting an examining physician's contradicted opinion. *Id*. at 830–31.

The opinion of a non-examining physician is not itself substantial evidence that justifies the rejection of the opinion of either a treating physician or an examining physician. *Id*. at 831. Factors that an ALJ may consider when evaluating any medical opinion include "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion." *Orn*, 495 F.3d at 631. The opinion of any physician, including a treating physician, need not be accepted, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r*, 554 F.3d 1219, 1228 (9th Cir. 2009).

Moreover, Social Security regulations expressly require a treating source's opinion on an issue of a claimant's impairment be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). If a treating source's opinion is not given controlling weight, the weight that it will be given is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence supporting the opinion, consistency with the record as a whole, the source's specialization, and other factors. *Id*.

Finding that a treating physician's opinion is not entitled to controlling weight does not mean that the opinion should be rejected:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Orn*, 495 F.3d at 631–32 (quoting Social Security Ruling 96-2p). Where there is a conflict between the opinion of a treating physician and an examining physician, the ALJ may not reject the opinion of the treating physician without setting forth specific, legitimate reasons supported by substantial evidence in the record. *Id*. at 632.

### b. The ALJ's Weighing of Dr. Zerrudo's, Dr. Salk's, and Dr. Finn's Opinions

The following table compares the doctors' opinions regarding the various mental limitations the Social Security Administration has deemed relevant in deciding whether a claimant can hold down a job. In this table, 0 = no limitation, 1 = mild limitation, 2 =

moderate limitation, 2.5 = moderately severe limitation, and 3 = severe limitation.[3] An em-dash indicates that the doctor was not asked about that limitation.

| The ability to— | Dr. Zerrudo | Dr. Salk | Dr. Finn |
|---|---|---|---|
| Remember locations and work-like procedures. | 0 | 0 | — |
| Understand and remember very short and simple instructions. | 1 | 0 | 1 |
| Understand and remember detailed instructions. | 3 | 1 | 2 |
| Carry out very short and simple instructions. | 1 | 0 | 1 |
| Carry out detailed instructions | 3 | 1 | 2 |
| Maintain attention and concentration for extended periods. | 2 | 2 | 2 |
| Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. | — | 1 | 1 |
| Sustain an ordinary routine without special supervision. | 2 | 1 | — |
| Work in coordination with or proximity to others without being distracted by them. | 2 | 1 | — |
| Make simple work related decisions. | 0 | 1 | — |
| Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. | 2–3 | 2 | 2 |
| Interact appropriately with the general public. | 2 | 1 | 1 |
| Ask simple questions and request assistance. | 1 | 0 | — |

---

[3] Dr. Salk used a different scale than Drs. Zerrudo and Finn. Although asked to evaluate the same limitations, Dr. Salk had four options for answers: (1) no evidence of limitation (very good); (2) not significantly limited (good/mild limitations); (3) moderately limited (fair/limited but not precluded); and (4) markedly limited (poor or none). Dr. Zerrudo and Dr. Finn had five options: (1) no impairment (none); (2) suspected impairment of slight importance which slightly affects ability to function (mild); (3) impairment which affects but does not preclude ability to function (moderate); (4) impairment which seriously interferes with ability to function (moderately severe); and (5) extreme impairment of ability to function (severe). The only substantial difference between these scales is the "moderately severe" option available to Drs. Zerrudo and Finn. In the 0–3 scale, this option has been assigned a value of 2.5, so that both scales place the mildest option at 0 and the most severe option at 3.

- 14 -

| The ability to— | Dr. Zerrudo | Dr. Salk | Dr. Finn |
|---|---|---|---|
| Accept instructions and respond appropriately to criticism from supervisors. | 3 | 2 | 2 |
| Get along with coworkers or peers without distracting them or exhibiting behavioral extremes. | 2.5 | 2 | — |
| Maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. | 0–1 | 0 | — |
| Respond appropriately to changes in the work setting. | 2–3 | 1 | 2 |
| Be aware of normal hazards and take appropriate precautions. | 0 | 0 | — |
| Travel in unfamiliar places or use public transportation. | 2–3 | 0 | — |
| Set realistic goals or make plans independently of others. | 2 | 2 | — |

Displayed in this manner, it becomes clear that Dr. Zerrudo had the most restrictive view of Buskohl's abilities, Dr. Salk had the least restrictive view, and Dr. Finn — to the extent he was asked — had a slightly more restrictive view than Dr. Salk.

The ALJ chose to give the most weight to Dr. Finn's opinions, meaning that the ALJ chose a non-examining physician over a treating physician, in a situation where the treating physician had been somewhat contradicted (both by Dr. Finn and Dr. Salk). To discount Dr. Zerrudo, the ALJ needed to state "specific and legitimate reasons" supported by substantial evidence in the record. *See Lester*, 81 F.3d at 831. In this regard, it is worth repeating that Dr. Finn is a non-examining physician. Therefore, his opinion is not itself substantial evidence that justifies rejecting Dr. Zerrudo's opinions. *See Lester*, 81 F.3d at 831.

The ALJ's most important reasons for discounting Dr. Zerrudo qualify as specific and legitimate : (1) "treatment records indicate that [Buskohl]'s condition has been stable with medication and [her] Global Assessment of Functioning have [*sic*] been as high as 70, which does not support a finding that the claimant has a moderate to severe limitation in any area"; and (2) "while [she] may have some limitation in social functioning, treatment records do not support a finding of moderate to severe limitations in this area."

The treatment records cited by the ALJ (*see* Tr. 40 (*citing* Exs. 6F [Tr. 379–413] & 17F [Tr. 506–607]) can be rationally interpreted as undermining Dr. Zerrudo's October 2008 and April 2009 opinions. Many of these treatment records come from Dr. Zerrudo himself, and show only mild symptoms. They show GAF scores noticeably higher than Buskohl's scores during the Closed Period. Although Buskohl's GAF dipped to 50 in April 2009 — a level that indicates "serious impairments in both social and occupational functioning," according to Dr. Finn (Tr. 65–66) — the overall trend could be interpreted as stability with proper medication, as Dr. Finn interpreted it. Because this is a rational interpretation of the evidence, the Court may not disturb it. *Orn*, 495 F.3d at 630. Accordingly, the ALJ appropriately gave less weight to the opinions of Buskohl's treating physician, Dr. Zerrudo.

Buskohl argues that Dr. Finn's opinion is not reliable because Dr. Finn did not have Dr. Zerrudo's October 2008 or April 2009 opinions. However, Dr. Finn did have Dr. Zerrudo's and others' numerous treatment records. Given that those treatment records support Dr. Finn's overall conclusions, as adopted by the ALJ, the ALJ did not err in placing significant weight on Dr. Finn's opinion. Thus, the ALJ committed no error here.

### 3. Residual Functional Capacity & Available Jobs

Residual functional capacity assessments comprise the "exertional and nonexertional capacities of the individual." SSR 96-8p, 1996 WL 374184, at *5. Exertional capacity relates to the claimant's ability to sit, stand, walk, lift, carry, push, and pull. *Id*. Exertional limitations are not at issue in Buskohl's case. Nonexertional limitations encompass, among other things, mental limitations, such as "understanding and remembering instructions and responding appropriately to supervision." *Id*. at *6. These are the sorts of limitations Buskohl asserts, and about which the various medical experts and the vocational expert were asked.

A proper residual function capacity assessment "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a

function-by-function basis." *Id*. at *1. Here, the ALJ adopted Dr. Finn's description of Buskohl's nonexertional limitations: mild to moderate restriction in activities of daily living; moderate impairment in social functioning; moderate difficulty maintaining concentration, persistence and pace; moderate impairment getting along with supervisors and accepting criticism; mild impairment in understanding, remembering, and carrying out simple instructions; and "problems with responding favorably on a consistent basis." (Tr. 33–34.) These nonexertional limitations should have factored into the residual functional capacity assessment, but they go unmentioned in the portion of the ALJ's opinion that explicitly discusses residual functional capacity. That portion simply declares that Buskohl can "perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple unskilled work tasks." (Tr. 36.)

"Simple unskilled work tasks" is not a nonexertional limitation. It describes the work, not the "nonexertional capacities of the individual." SSR 96-8p, 1996 WL 374184, at *5 (emphasis added). By describing Buskohl's residual functional capacity as "limited to simple unskilled work tasks," the ALJ jumped immediately to the conclusion that Buskohl can work. The ALJ short-circuited the question at issue: whether Buskohl can work given her nonexertional limitations.

The order of presentation of the evidence appears to have forced the ALJ into this error. The vocational expert is usually the one to opine whether a claimant can work given his or her limitations. As described above, the ALJ first asked the vocational expert, "[C]onsider a hypothetical person the same age, education and work history as Ms. Buskohl. If this person were restricted to simple, unskilled work tasks, is there any work this hypothetical person could perform?" (Tr. 92.) Such a question yields nothing useful about Buskohl's current state because it does not ask the vocational expert to assume any mental limitations. The vocational expert nonetheless responded that such a person could be a packager, production worker, or inspector.

The ALJ and Buskohl's attorney then posed hypotheticals that included mental limitations derived from Dr. Zerrudo's and Dr. Salk's respective opinions. The vocational expert concluded that persons with such limitations could not work. Finally, at a subsequent hearing, Dr. Finn offered his opinion regarding Buskohl's mental limitations, but no vocational expert testified at that hearing.

In her written opinion, the ALJ discounted Dr. Zerrudo's and Dr. Salk's opinions and adopted Dr. Finn's opinion. However, because the vocational expert had testified *before* Dr. Finn, there was no evidence in the record that work existed for a person with the limitations Dr. Finn identified. The ALJ therefore fell back on the only other hypothetical posed to the vocational expert: "If this person were restricted to simple, unskilled work tasks, is there any work this hypothetical person could perform?" This became the residual functional capacity assessment: "a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple unskilled work tasks."

This is error in two ways. First, it is error at "step four," where the ALJ must determine if the claimant can perform her past relevant work. The ALJ never asked the ALJ whether Buskohl can perform her past relevant work. But this is harmless error because it favored Buskohl. The ALJ "agreed" with the vocational expert's nonexistent testimony that "this claimant, given the above noted limitations, is unable to perform the demands of her past relevant work." (Tr. 43.) Accordingly, there is no need to reverse for this error.

Second, it is error at "step five," where the ALJ must determine if the claimant can perform any other work considering her residual functional capacity, age, education, and work experience. As discussed above, a residual functional capacity assessment of "limited to simple unskilled work tasks" begs the question — it assumes that the claimant can perform other work.

Nonetheless, this "step five" error is still harmless because the ALJ did not need a vocational expert to establish that someone with the limitations identified by Dr. Finn can

perform "simple unskilled work tasks." The Social Security regulations define "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). The assessment that Buskohl is mentally able to perform the full range of "simple unskilled work tasks" is supported by Dr. Finn's opinion. Dr. Finn found Buskohl had no more than moderate work-related mental limitations, but no preclusive limitations. And the jobs identified by the vocational expert — packager, production worker, and inspector — accommodate those limitations. The ALJ's errors therefore do not require reversal.

### 4. Buskohl's Relatives' Statements

Buskohl's father, mother, sister, and aunt all submitted written statements favorable to Buskohl's disability claim. "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). Such testimony "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If an ALJ discredits the testimony of a lay witness, the ALJ must provide reasons "that are germane to each witness." *Id*. The ALJ did so here, addressing each relative's statement and explaining why it did not affect the conclusion. The ALJ therefore committed no error.

IT IS THEREFORE ORDERED that the Clerk enter judgment affirming the final decision of the Commissioner of Social Security. The Clerk will terminate this case.

Dated this 28th day of November, 2011.

_____
Neil V. Wake
United States District Judge